WO

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| Stanley J. Guillory, | ) |
| Plaintiff, | ) |
| v. | ) CV 05-352 TUC DCB |
| Greenlee County, a political subdivision of the State of Arizona, | ) **O R D E R** |
| Defendant. | ) |

The Court grants Defendant's Motion for Summary Judgment on all claims alleged in the Complaint.

### Plaintiff's Complaint[1]

Plaintiff is African-American. He is an employee of Phelps Dodge Mining Corporation (PD), working at the Morenci mine in Greenlee County. Plaintiff alleges that on August 13, 2004, he filed a complaint with the Greenlee County Sheriff's Office alleging that between June 18 and 22, 2004, he was "nearly smashed" into a canyon by a fellow PD employee[2] while driving an ATV work vehicle at PD's Bagdad mine in Yavapai County. (P's SoF, Ex. 4: Guillory Statement.) Eleven days later, Plaintiff opened his work locker at the Morenci mine and found an effigy soaked in fuel with the words, "Your [sic] Dead Nigger," with a noose and rope tied around its neck. PD's security officer responded first, and then called the Greenlee County Sheriff's Department.

---

[1] The facts reflected in this section are found in the Complaint at ¶¶ 15-83, unless other citations are provided for them.

[2] Plaintiff knew and reported the perpetrator of this incident: his boss, Dennis Krugg. (P's SoF, Ex. 3: Easley Depo. at 10-11.)

Deputy Frank Montoya investigated the incident for the Greenlee County Sheriffs Department. He did not make a connection between the ATV-Bagdad incident and the effigy placed in the Plaintiff's locker.

When he arrived at PD, the effigy had been removed from Plaintiff's locker by the PD security officer investigating the matter, who had interviewed several employees regarding the incident. *Id.* at 31. Deputy Montoya considered six or seven PD employees to be suspects, but failed to interview anyone except the Plaintiff. He asked for, and was refused, access to PD's investigative report. *Id.* at 34, 84. Several days later, the PD report was provided to Deputy Montoya. *Id.*

Deputy Montoya took pictures of the effigy. He failed to take the pictures to be developed for over a month, failed to promptly retrieve them, and they were lost by Walmart's photography center.

Deputy Montoya had never received any training regarding hate crimes, and he was unaware that Arizona has a hate crime statute. He did not know that there were statutory training and reporting requirements for hate crimes. He did not know that Greenlee County could avail itself of an FBI hate crime unit, experienced in handling these type of crimes. He considered the effigy to be a hate crime, but the County Attorney saw it as a misdemeanor, threatening and intimidating case. Sheriff Richard McCluskey considered it to be a serious hate crime, but he was not involved in the investigation and never read Deputy Montoya's report.

Instead of sending the effigy to the Department of Public Safety (DPS), the County Attorney approved, and Deputy Montoya turned the effigy over to PD to hire a private company, the Drake Group, to conduct forensic testing on the effigy. Deputy Montoya allowed the chain of custody to be broken by turning the effigy over to PD and created a conflict of interest by allowing it to be tested by a subsidiary company of PD. The effigy was dismantled during forensic testing, and the results of the forensic tests were negative.

Plaintiff alleges that the Defendant's failure to train the Sheriff's personnel in investigating hate crimes violated his constitutional right of access to the courts to sue the perpetrator in civil court for tort damages. (Complaint at ¶ 85.)  Plaintiff alleges that

Defendant's failure to investigate the earlier ATV-Bagdad incident created the future danger of the threat in effigy against his life in violation of his right that "no state shall make or enforce any law which shall . . . deprive any person of life, liberty, or property, without due process of law." *Id.* at ¶ 95.

Plaintiff also alleges state law causes of action for intentional and negligent infliction of emotional distress and gross negligence. He asserts that Defendant's conduct intentionally or negligently caused him to suffer severe emotional and physical distress and injuries. He alleges that he incurred medical expenses and will incur future medical expenses as a direct and proximate cause of the extreme and outrageous conduct of the Defendant. He asserts that Defendant was grossly negligent for failing to find out who placed the effigy in his locker.

<u>Standard of Review: Motion for Summary Judgment</u>

Defendant Greenlee County seeks summary judgment on all counts.

On summary judgment, the moving party is entitled to judgment as a matter of law if the Court determines that in the record before it there exists "no genuine issue as to material fact." Fed.R.Civ.P. 56(c). In determining whether to grant summary judgment, the Court views the facts and inferences from these facts in the light most favorable to the non-moving party. *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 577 (1986).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment because the requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A material fact is any factual dispute that might effect the outcome of the case under the governing substantive law. *Id.* at 248. A factual dispute is genuine if the evidence is such that a reasonable jury could resolve the dispute in favor of the non-moving party. *Id.*

Here, the Defendant bears the initial burden of demonstrating the absence of a genuine issue of material fact, but is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-325 (1986). The Defendant is under no obligation to negate or disprove matters on which the Plaintiff bears the burden of proof at trial. *Id.* at 325. Rather, the Defendant need only

demonstrate that there is an absence of evidence to support the Plaintiff's case. *Id.* The burden then shifts to the Plaintiff to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed.R.Civ.P. 56(e)). To carry this burden, the Plaintiff cannot rest upon mere allegations or denials in the pleadings or papers. *Anderson*, 477 U.S. at 252.

The trilogy of 1986 cases cited above ushered in a "new era" of summary judgment motions for the federal courts. *See Rand v. Rowland*, 154 F.3d 952, 956 -957 (9th Cir. 1998) (describing the Supreme Court as paving the way toward mainstream acceptance of the summary judgment procedure) In their aggregate, they opened the door for the district courts to rely on summary judgment to weed out frivolous lawsuits and avoid wasteful trials. *Id.* at 956-957; 10A Charles A Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 468 (1998). As explained in *Celotex*: "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "If evidence is merely colorable ... or is not significantly probative, summary judgment may be granted." *Eisenberg v. Insurance Co. of North Am.*, 815 F.2d 1285, 1288 (9th Cir. 1987).

Therefore, motions for summary judgment are viewed "not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (citations omitted). Accordingly, the rules governing motions for summary judgment are enforced with regard not just for rights of the nonmovant, but also for the rights of the party contending that there exists no genuine issue of material fact. *Id.*

The Judge's role on a motion for summary judgment is not to determine the truth of the matter or to weigh the evidence, or determine credibility, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 252. The inquiry mirrors the standard for a directed verdict: whether the evidence presented reveals a factual disagreement requiring

submission to a jury or whether evidence is so one sided that one party must prevail as a matter of law.

## 42 U.S.C. § 1983: Municipal Liability[3]

Section 1983 provides relief when a party's federally protected rights have been violated by a state or local official or other person who acted under color of state law. 42 U.S.C. § 1983. While it authorizes a cause of action, section 1983 does not itself create or establish substantive rights so a plaintiff must demonstrate a violation of a right protected by the Constitution or a federal statute other than section 1983. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 618 (1979). The elements of a claim under 42 U.S.C. § 1983 are as follows: 1) a violation of rights protected by federal law; 2) proximately caused by the conduct of a person; 3) acting under color of state law (any statute, ordinance, regulation, or a state custom or usage). Martin A. Schwartz, Section 1983 Litigation Claims and Defenses §1.04, at p. 1-17-p. 1-18 (4th ed. 2005) (citations omitted). When a plaintiff seeks to establish municipal liability, the plaintiff must satisfy an additional element, which is that the violation of plaintiff's federal right was attributable to enforcement of a municipal policy or practice. *Id.*

The framework governing municipal liability derived from three Supreme Court decisions: *Monell v. Department of Social Services*, 436 U.S. 658 (1978); *Owen v. City of Independence*, 445 U.S. 622 (1980), and *City of Newport v. Fact Concerts*, 453 U.S. 247 (1981). Section 1983 liability must be based upon enforcement of a municipal policy or custom that caused the deprivation of the plaintiff's federal right, and not upon the municipality's mere employment of a constitutional tortfeasor. *Monell*, 463 U.S. at 692. Municipal liability may not be imposed against municipal entities based on *respondeat superior* because the governing principle of legal responsibility under section 1983 is that each defendant, whether a subordinate or superior officer, or a state or municipal entity, may be found liable only for that defendant's own wrongs. *Id.* at 691-693. Consequently, municipal liability attaches "when

---

[3]*Brewster v. Shasta County,* 275 F.3d 803, 805 (9th Cir. 2001) (the question of county liability under 1983 is a question of federal law, but whether the Sheriff acts as a policymaker for the county hinges on state law.)

execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694.

In this action, the Plaintiff asserts municipal liability based on the actions of the Defendant Greenlee County's Sheriff and his deputies because their actions "may fairly be said to represent official policy." According to the Plaintiff, liability is imposed because the agent's status cloaks him with the governmental body's authority. (P's Response at 12-13.)

The Supreme Court in *Pembaur v. Cincinnati*, 475 U.S. 469 (1986), and *St. Louis v. Praprotnik*, 485 U.S. 112 (1988), held that municipal liability may be premised on a single decision by a municipal official with final policymaking authority, and that whether an official has such authority depends upon state law. Under Arizona law, the Sheriff is the person who exercises the County's governmental authority, even though under the Arizona Constitution, his duties are fixed by law and the County has no control over how he carries out those duties. (P's Response at 13 (*citing Flanders v. Maricopa County*, 54 P.3d 837, 847 (Ariz. App. 2002)).

It is undisputed that the Defendant Greenlee County is a political subdivision subject to suit. A.R.S. 11-201(A). The Sheriff is an enumerated officer of the Defendant County. 11-401(A)(1). As a matter of law, the County is liable for policies made by the Sheriff, pursuant to his designated powers and duties as provided for by statute: A.R.S. § 11-441. *See e.g., Flanders*, 54 P.3d at 847 (holding county liable because the sheriff is a county officer whose duties regarding jail operations are fixed by law, A.R.S. § 11-441(5)).

Section 11-441(A)(2) provides that the Sheriff shall arrest and take before a magistrate for examination all persons who attempt to commit or who have committed a public offense. The purpose of this duty is the prompt and orderly administration of criminal justice, including the Sheriff's discretionary investigatory determination of when enough evidence has been obtained to make an arrest. *Cf, Arizona v. Monaco*, 83 P.3d 553, 558-59 (Ariz. App. 2004) (explaining the statute does not create a constitutional right to be arrested upon first discovery of criminal activity because sheriff must be permitted to exercise discretion to conduct

investigation until enough evidence is obtained for a conviction). This makes the Sheriff the final policymaker regarding criminal investigations.

Under A.R.S. § 11-444, actual and necessary expenses of the Sheriff must be allowed and paid by the County. The Court finds that this fiscal independence further demonstrates that the Sheriff is the designated and final policymaker for the County regarding the needs of its officers for the prompt and orderly administration of criminal justice, including training for investigating hate crimes.

A policy, for purposes of a 1983 claim against a government entity, "is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Long v. Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) (citations omitted). Municipal liability may also be premised upon a municipal custom or practice that is so widespread as to constitute a de facto municipal policy. *Monell*, 436 U.S. at 694.

"A policy can be one of action or inaction." *Long,* 442 F.3d at 1185 (*citing City of Canton v. Harris*, 489 U.S. 378, 388 (1989)); the policymaker must have intended the deficient training program to apply over time to multiple employees, *id.* (*citing Board of County Commissioners v. Brown*, 520 U.S. at 407). Here, the alleged inadequate training was a policy of the County because the Sheriff was the policymaker for the County regarding officer training, and he failed to require training regarding hate crime investigations, and this training policy applied to all officers over an extended period of time.

### Deprivation of a Constitutional Rights

Plaintiff argues that Arizona's hate crime statute reflects the constitutional magnitude of his protected rights, but he mis-characterizes A.R.S. 13-702(C)(15) because it is actually a sentencing statute that provides various aggravating and mitigating factors, including a multitude of other enhancement factors such as: committing an offense using a deadly weapon, inflicting serious physical injury, causing the victim's death, causing the death of an unborn child, having been previously convicted of a felony, committing the offense in the presence of

a child, or in retaliation for a victim's reporting a criminal activity, etc.   None of these other sentencing enhancement factors are even arguably protected constitutional rights.

Plaintiff asserts that A.R.S. § 41-1822 requires basic law enforcement training to include courses in "responding to and reporting" all criminal offenses that are motivated by race, color, religion, national origin, sexual orientation, gender or disability.  Plaintiff asserts that this statute reflects the importance of training regarding hate-crime investigations, and the County's failure to train in violation of this statutory mandate is evidence of its deliberate indifference to his constitutional rights.

The statute, A.R.S. § 41-1822, pertains to the minimum courses required at the law enforcement training academy for certifying peace officers in Arizona. The statute also requires training in the nature of unexplained infant death (sudden infant death (SID)), handling SID cases, first responder awareness and sensitivity training, importance of forensically competent death scene investigation, SID protocol of investigation, use of a SID checklist, and community support networks and grief counseling.  The training provisions related to SID are more specifically aimed at proper investigative procedures than those relied on by the Plaintiff for hate crimes, which require courses in responding to and reporting hate crimes.  There is no argument that the legislature's inclusion of SID training in A.R.S. 41-1822 reflects any intent to protect a constitutional right.

Neither statute reflects nor creates any constitutionally protected right to have law enforcement officers trained in hate crime investigation;[4] noncompliance with A.R.S. 41-1822 is not deliberate indifference to a constitutional entitlement.  There is no constitutional right to have someone arrested. *See, Town of Castle Rock v. Gonzales*, 125 S. Ct. 2796, 2810 (2005) (the benefit a third party, including a third-party victim, may receive from having someone else arrested for a crime generally does not trigger either substantive or procedural protections under the Due Process Clause.)

---

[4]The legislature expressly provided that the "section does not create a cause of action or right to bring an action, . . . ."  A.R.S. § 1822(D).

1    Plaintiff argues that the codification of hate crime training reflects that such training is necessary to prevent utterly incompetent investigations in order to ensure that victims of hate crimes are not denied access to the courts or subjected to state created danger.

"The right of access to the courts is a fundamental right guaranteed by the Constitution." *Delew v. Wagner*, 143 F.3d 1219, 1222 (9th Cir. 1998). The purpose of an access claim "is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Christopher v. Harbury*, 536 U.S. 403, 414-15 (2002). The right of access is "*ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court.*" *Id.* at 415. So, a plaintiff may sue for loss of access to the courts where police cover-up or falsify an investigation, preventing him or her from discovering the cause of action until time for filing suit expires under a statute of limitations. *Id.* at 414 (discussing cases).

In order to state a claim, the Plaintiff must identify in the Complaint: 1) a nonfrivolous arguable underlying claim; 2) the official acts frustrating the litigation, and 3) the remedy that may be awarded as recompense, but that is not otherwise available in a future suit. *Id.* The predicate claim must "be described well enough to apply the nonfrivolous test and to show that the arguable nature of the underlying claim is more than hope." *Id.* at 416. Here, Plaintiff's claim fails for precisely this reason. He fails to describe any predicate claim that is more than the mere hope that a better investigation may have discovered the perpetrator of the effigy threat, in other words– a defendant he could sue in civil court for damages.

"It is well established that the Constitution protects a citizen's liberty interest in her own bodily security." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (citing *Ingraham v. Wright*, 430 U.S. 651, 673-74 (1977); *Wood v. Ostrander*, 879 F.2d 583, 589 (9th Cir. 1989)). "It is also well established that, although the state's failure to protect an individual against private violence does not generally violate the guarantee of due process, it can where the state action 'affirmatively places the plaintiff in a position of danger,' that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise

- 9 -

faced." *Id.* (citing *DeShaney v. Winnebago County Dep't of Social Service*, 489 U.S. 189, 197 (1989); *Wood*, 879 F,2d at 589-90).

In *Kennedy*, the plaintiffs reported that their next door neighbor molested their daughter and asked officers to notify them before the neighbor was contacted regarding the charges because he was very violent, and they wanted to take precautions to protect themselves. The police officer contacted the neighbor, and notified the plaintiffs of the contact within approximately 15 minutes, but it was late in the evening so plaintiffs were unable to make arrangements to leave their home until the next day. Police officers assured the plaintiffs that they would patrol the neighborhood that night, but failed to do so. The neighbor broke into plaintiffs' home and shot them, killing the husband. The court found that the police acted affirmatively to create a danger that would not have existed "but for" the notification to the neighbor of the charges being made against him by the plaintiffs.

Here, Plaintiff alleges that the Defendant's failure to investigate the ATV-Bagdad incident subjected him to further hate-crime victimization. The state created this danger, if "but for" Defendant's failure to investigate the ATV incident Plaintiff would not have received the threatening effigy. The ATV incident occurred between June 18 and 22, 2004, in Bagdad, Arizona, in Yavapai county. On August 13, 2004, Plaintiff reported it to Defendant, Greenlee County Sheriff's Department, so that he could secure a restraining order against the known perpetrator of the ATV incident. (P's SoF, Ex. 3: Easley Depo. at 15.) The County Sheriff's office did nothing regarding the complaint for two reasons. First, the sheriff's department does not issue restraining orders, (P's SOF, Ex. 1: Montoya Depo. at 214), and second, the ATV incident occurred outside the Defendant's jurisdiction, *id.* at 212. There is no allegation nor is there any evidence that anyone outside Plaintiff's family or the Sheriff's department knew about the complaint made by the Plaintiff on August 13, 2006, or about the Defendant's failure to investigate it. It is, therefore, impossible that the ATV-Bagdad complaint or the failure to investigate it had any impact on what happened or caused anything to happen that would not have otherwise happened. There is no causal connection between the failure to investigate the ATV incident and the placing of the effigy in Plaintiff's locker.

The Court finds no constitutional violation of either Plaintiff's right of access to the courts or his right to be free from state created dangers.

<u>Failure to Train: Deliberate Indifference</u>

On summary judgment this Court asks only whether the Plaintiff presents a genuine issue of triable fact as to whether or not he suffered a constitutional deprivation because the Defendant's training policy was deliberately indifferent to his constitutional rights. Even if the Court found affirmatively on the first prong of the assessment, Plaintiff fails to establish the second prong. There can be no liability under 42 U.S.C. § 1983 because the Plaintiff does not establish: 1) that the County has customs or policies that amount to deliberate indifference to these constitutional rights; and 2) that these customs or policies were the moving force behind the alleged constitutional violations. *Long*, 442 F.3d at 1186 (citing *Gibson v. County of Washoe*, 290 F.3d 1175, 1193-94 (9th Cir. 2002) (discussing three prong test for liability under 42 U.S.C. § 1983).

Deliberate indifference may be shown as follows: 1) there is continued adherence by policymakers to an approach that they know or should know has failed to prevent tortious conduct by employees because this may establish the conscious disregard for the consequences of their actions– the deliberate indifference necessary to trigger municipal liability, or 2) a pattern of tortious conduct by inadequately trained employees that may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the moving force behind the plaintiff's injury. *Id.* at 1186 (citing *Brown*, 520 U.S. at 407-08).

A failure to train claim may also succeed without showing a pattern of constitutional violations where "'a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Id.* (*quoting Brown*, 520 U.S. at 409). "The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens'

rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice– namely a violation of a specific constitutional right." *Id.*; *see also*, *Merritt v. County of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989) (training programs are assessed in relation to the tasks the particular officer must perform and are deemed adequate if they "enable officers to respond properly to the usual and recurring situations with which they must deal.")  For inadequate training to give rise to municipal liability, it must be closely related to the constitutional violation. *Long*, 442 F.3d at 1190 (citing *Gibson*, 290 F.3d at 1196).

Plaintiff does not assert a pattern of constitutional violations, therefore, the Court looks at whether or not the alleged constitutional violations are a highly predictable consequence of the failure to train law enforcement officers in hate crime investigations and whether such investigations are recurring situations faced by law enforcement officers in Greenlee County.

The Defendant asserts that its officers do not have to deal with hate crimes and that this incident was unique, not usual, and not recurring. Deputy Montoya graduated from the police academy in 1985, prior to the requirement for hate crime training. *See* Laws 1994, Ch. 324, § 5 (adding A.R.S. § 41-1822A(4)(a)). He worked for the Clifton, Arizona, Police Department from 1985 to 1987, and for Greenlee County Sheriff's Office from then to the time of the incident. (D's SoF , Ex. 3: Montoya Affidavit at ¶¶ 1-3.) He is accordingly, a certified police officer. He admits that he never received any training regarding hate crime investigations. (P's SoF, Ex. 1: Montoya Depo. at 29.) Deputy Montoya, an officer with 18 years of law enforcement experience in Greenlee County, attests that he was not aware of any other cases in Greenlee County where the alleged victim was targeted because of race, creed, color, or sexual orientation. (D's SoF at 29; Ex. 1: Montoya Transcript at 250-258; Ex. 3: Montoya Affidavit at ¶¶ 4-5.)  Given this uncontradicted evidence, the Plaintiff can not establish a likelihood that the situation is usual and will recur.

The Plaintiff also fails to present any evidence reflecting that the alleged constitutional violations are a predictable consequence of a lack of training for hate crime investigations beyond a general common sense notion that well trained officers will conduct better

- 12 -

investigations, thereby, securing access to the courts for citizens and preventing state created dangers.

The statute relied on by the Plaintiff, A.R.S. 41-1822(A)(4)(a), requires training in responding to and reporting hate crimes. The required training speaks to the unique sensitivity that law enforcement officers may have to exhibit when encountering victims of hate crimes and the reporting requirements for state and federal governments to track hate crimes. There is no evidence of any unique characteristics related to hate crime investigations that suggests the need for any specialized investigative training. The Court finds that general investigative training is adequate to secure all citizens, including victims of hate crimes, access to the courts and to protect them from state created danger of further victimization.

Without connecting the alleged constitutional violations to a lack of hate crime training, as compared to general law enforcement training, Plaintiff can not make the causal connection required for liability to attach under section 1983. The deficient training program must be closely related to the alleged constitutional violation such that the violation would have been avoided under a program that was not deficient. *City of Canton*, 489 U.S. at 391. Plaintiff must prove that the lack of training "actually caused" the constitutional violation. *Id.* It will not suffice to prove that an injury or accident could have been avoided with better or more training because such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to usual and recurring situations with which they must deal. *Id.*

Allegedly, Deputy Montoya failed to interview suspects, take in and pick up crime scene pictures, broke the chain of custody by turning the effigy over for a private company to conduct the forensic study, and failed to connect the ATV-Bagdad incident to the subsequent threatening effigy placed in Plaintiff's locker. Not once does the Plaintiff identify any investigative measure taken or not taken that is unique to a hate crime. *See also* (P's SoF, Ex. 7: Expert Report (criticizing inadequacy and incompetency of investigation). All of the alleged deficiencies, if in fact they amount to an inadequate investigation of this crime, would amount to an inadequate

- 13 -

investigation of any crime. Plaintiff fails to present any evidence correlating the lack of hate crime training to the alleged sloppy police work conducted in this case.

An allegedly incompetent investigation is not enough. "The Constitution does not provide a remedy for every wrong that occurs in society." *Mueller v. Gallina*, 311 F. Supp.2d 606, 609 (Mich. 2004) (citations omitted). Plaintiff's claim against Defendant sounds more in state tort law than in federal constitutional law. *Id.*

### State Tort Claims:

Plaintiff's pendant state law claims are subject to dismissal at the discretion of this Court. After federal claims are dismissed, the general rule is to dismiss state law claims if the federal claims are dismissed before trial. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1996). Pendant jurisdiction over state law claims is based on considerations of judicial economy, convenience and fairness to litigants, *id.,* so that jurisdiction may be exercised over a state law claim, if there is a relationship between it and the federal question being resolved by the court, *id.* at 725. Consequently, there is no reason to exercise pendant jurisdiction over a case where the federal claims are dismissed at the outset of an action. Ordinarily, dismissal is "without prejudice" because it is not an adjudication of the merits of the claim. *Figueroa v. Buccaneer Hotel Inc.*, 188 F.3d 172, 182 (3rd Cir. 1999). Here, however, discovery has been completed, and the case is ready to proceed to trial.

Plaintiff argues that the criminal investigation conducted by Deputy Montoya was grossly negligent and an intentional infliction of emotional distress. Plaintiff withdraws his claim of negligent infliction of emotional distress. (Response at 23.) Pursuant to A.R.S. § 12-820.02A, public entities like Defendant Greenlee County have qualified immunity from liability for failing to make an arrest, unless the public employee, acting within the scope of his or her employment, intended to cause injury or was grossly negligent.[5]

In Arizona, this qualified immunity applies to an officer's failure to make an investigatory stop, which may or may not lead to an arrest. *Walls v. Arizona Dept. of Public*

---

[5]The parties have not provided evidence that the jurisdictional notice requirements for authorization of a claim against a public entity or public employee have been met in this case. A.R.S. § 821.01.

- 14 -

*Safety*, 826 P.2d 1217, 1220-1221 (Ariz. App. 1991). The Court finds that it applies here to the investigation of the alleged hate crime, which may or may not have led to an arrest. Ordinarily, the issue of gross negligence is a question of fact for the jury, but may be decided by the Court on summary judgment where no evidence is introduced that would lead a reasonable person to find gross negligence. *Id.* at 1221 (citations omitted).

In Arizona, "[a] party is grossly or wantonly negligent if he acts or fails to act when he knows or has reason to know facts which would lead a reasonable person to realize that his conduct not only creates an unreasonable risk of bodily harm to others but also involves a high probability that substantial harm will result." *Id.* (citing *Nichols v. Baker,* 416 P.2d 584, 586 (Ariz. 1966). "Gross negligence differs from ordinary negligence in quality and not degree." *Id.* (citing *Kemp v. Pinal County,* 474 P.2d 840, 843 (Ariz. App. 1970). The Arizona Supreme Court described gross or wanton negligence in *Scott v. Scott,* 252 P.2d 571, 575 (Ariz. 1953) as follows:

> Wanton negligence is highly potent, and when it is present it fairly proclaims itself in no uncertain terms. It is "in the air," so to speak. It is flagrant and evinces a lawless and destructive spirit.

In *Walls*, the officer admitted that he had probable cause to believe that a driver was driving under the influence of alcohol and that for some period of time he intended to stop the vehicle, but barricades in the area restricted traffic so he believed that he could continue following the driver until he could more safely stop him. The plaintiff alleged that the driver of the vehicle was intoxicated and struck plaintiff's vehicle because the officer failed to stop and arrest the drunk driver. The court held that the officer's concerns for public safety in delaying the stop reflected that the officer was not acting with a lawless and destructive spirit and foreclosed any conclusion of gross negligence. *Id.* at 1222.

Here, Deputy Montoya attests that initially PD's human resource people insisted they would have to be present if he interviewed the employee suspects, so he just took down the employee names and decided to contact these individuals at their homes so he could interview them without PD's presence. (P's SoF, Ex. 1: Montoya Depo. at 31-32.) He explained that

Morenci is a small community so he was not concerned about getting names, addresses, telephone numbers or other information about these employees. *Id.* at 205-206. When PD security refused to turn over their report, Deputy Montoya contacted the county attorney's office about obtaining it, but then PD decided to release it to him. *Id.* at 34, 84. Deputy Montoya turned the effigy over to PD to send it to a private forensic company because he hoped to get the test results back sooner than if he sent it to the Department of Public Safety. *Id.* at 62-64, 96. He had the PD security officer sign for the effigy so he did not believe he was breaking the chain of custody. *Id.* at 145-46.

Deputy Montoya did not want to interview the suspected PD employees until he obtained the forensic report and hoped forensic evidence from the effigy would assist him in questioning suspects. *Id.* at 66, 112. He obtained the report in approximately 30 days, but the forensic results were negative. *Id.* at 143. As of the time of his deposition, January 7, 2005, Deputy Montoya had still not interviewed anyone regarding the August 4, 2004, effigy incident. *Id.* at 69. The case was not closed. *Id.* at 108.

Deputy Montoya took pictures of the effigy on the day of the incident, but similarly to his delaying interviews with suspects, he waited approximately a month (until October or November) to have the film taken to be developed. *Id.* at 42, 44. Deputy Montoya believed the officer who dropped the film off would pick it up, but the film was left at Walmart for almost 3 months, and it was lost. *Id.* at 45.

While he did not agree with the County Attorney, Deputy Montoya had been told that the effigy incident was a not a felony crime of violence but was a threatening and intimidating misdemeanor offense. *Id.* at 36-37.

Deputy Montoya went to interview the Plaintiff on the evening of the incident. *Id.* at 38. The Plaintiff said that he had had several whistle-blowing type incidents with fellow employees, and therefore, Deputy Montoya became less concerned about the effigy being a pure hate crime. *Id.* at 131. Plaintiff reported one co-worker that did not like him very much,

with whom he had had words earlier in the year, but the man had not bothered him afterwards. *Id.* at 241-42.

During his interview of Plaintiff, Deputy Montoya asked him several pointed questions about past incidents. "Have you ever been threatened physically by anybody?" Has anybody threatened to kill you, hurt you in any way? "Is this the only incident you've had where as far as like have you had anything damaged or anything?" (P's SoF, EX. 6: Motoya/Guillory Interview at 7.) To each question, Plaintiff responded: "no." *Id.* Deputy Montoya asked Plaintiff if he could think of any other incidents that stood out in his mind. *Id.* at 8. Plaintiff responded with information about the co-worker that just didn't like him, but did not mention the allegedly life threatening Bagdad, ATV incident. *Id.* Plaintiff's only mention of the Bagdad incident was to explain to Deputy Montoya that PD was investigating several of his co-workers because of complaints he had made to PD, starting with the Bagdad incident. *Id.* at 14-15.

Deputy Montoya did not investigate the ATV incident because it occurred in Bagdad, Arizona, in Yavapai County out of Defendant's jurisdiction *Id.* at 205-06. Deputy Montoya understood that the perpetrator of the Bagdad ATV incident was an employee of the Bagdad mine and, therefore, not a co-worker with Plaintiff in Morenci. *Id.* at 212. PD informed Deputy Montoya that the perpetrator of the ATV incident had been fired, *id.* at 206, prior to the effigy incident (P's SoF, Ex. 6: Montoya/Guillory Interview at 14.) Plaintiff did not report that there was any racial aspect to the ATV incident so the deputy did not consider it related. (P's SoF, Ex. 1: Montoya Depo. at 207, 208.)

Deputy Montoya "just did not connect the dots" between the two incidents. *Id.* at 225. Deputy Montoya had sent another officer to take the report regarding the ATV incident and was not aware that the Plaintiff sought a restraining order. *Id.* at 214. The Sheriff's department would not take notice of the restraining order until one was issued by the justice of the peace. *Id.* at 215.

Deputy Montoya was the Undersheriff at the time of the effigy incident and he had 10,000 administrative things all in mind at the time. *Id.* at 226-227.

While Deputy Montoya certainly could have done more, he is immune from any negligence claim,[6] and liability exists only if Deputy Montoya's conduct was grossly negligent or intentional. A.R.S. § 12-820.02. Given Deputy Montoya's undisputed explanations for his investigatory decisions, no reasonable juror could find that Deputy Montoya conducted himself with a lawless and destructive spirt. In addition to failing to support a claim of gross negligence, these facts will not support a finding of intentional infliction of emotional distress, which in addition to intentional conduct requires conduct that was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987).

Unlike the federal claim under 42 U.S.C. § 1983, where the Court's determination that the Sheriff was a policymaker for the County subjected the Defendant to liability for his policy decisions, here Plaintiff presents no independent theory of negligence against the County. Consequently, the Court considers whether or not the County is subject to liability for the alleged grossly negligent conduct of Deputy Montoya on the basis of *respondeat superior*. The

---

[6]The Court notes that if this case were judged by standards applicable to ordinary negligence, the Plaintiff would be required to establish: a duty owed to the Plaintiff, a breach thereof and injury proximately caused by such breach. *Morris v. Ortiz*, 437 P.2d 652, 654 (Ariz. 1968). The general rule pertaining to governmental agencies and public officers is that the duty imposed on public officials is to the public, and there is no duty owed to the individual unless some special relationship has been created between the official and the individual. *See, Massengill v. Yuma County*, 456 P.2d 376, 380 (Ariz. 1969) (citations omitted) (finding duty to arrest drunk driver was owed to general public, not to individual plaintiffs whose decedents were killed in collision with drunk driver), *but see Ryan v. State*, 656 P,2d 597, 599 (Ariz. 1982) (overruling *Massengill* public/private duty distinction and applying Restatement of Torts § 319: duty imposed on one who takes charge of a third person having dangerous propensities), *but see*, *Clouse ex rel. Clouse v. State*, 16 P.3d 757, 764-765 (Ariz. 2001) (discussing *Ryan* within context of public official immunities, which were subsequently codified in A.R.S. 12-820.02). *See also*, *Calnimptewa v. Flagstaff Police Dept.*, 30 P.3d 634, 639 (Ariz. App. 2001) (explaining that where immunity pursuant to 12-820.02 does not apply, ordinary standards for negligence apply.); Restatement (Second) of Torts § 895D (1979) (a public officer is not immune from tort liability, except he is immune for an administrative act or omission if he is engaged in a discretionary function), *see*, *Gonzales*, 125 S. Ct. at 2806 (describing open-ended discretionary nature of investigatory police conduct).

- 18 -

doctrine holds an employer or principal liable for the employee's or agent's wrongful acts committed within the scope of the employment or agency.

Under A.R.S. § 11-251, the Greenlee County Board of Supervisors' powers and duties to supervise its county officers, including the Sheriff, does not extend to having control over the Sheriff in the exercise of statutorily mandated duties, and therefore, the doctrine of *respondeat superior* does not apply to impose liability on the County. *See Flanders*, 54 F.3d at 847 (county has no control over Sheriff because duties are fixed by Arizona Constitution and state statute, but sheriff, nevertheless, acts as governmental authority for the county); *Fridena v. Maricopa County*, 504 P.2d 58, 61 (Ariz. App. 1972) (no control over sheriff in service of writs of restitution, therefore, no liability under doctrine of *respondeat superior* liability); *Hernandez v. Maricopa County*, 673 P.2d 341, 344 (Ariz. App. 1983) (county has no power to control implementation and execution of justice of peace's duties, which are imposed by Constitution and statute, there is no master-servant or principal-agent relationship to support *respondeat superior* liability); *Yamamoto v. Santa Cruz County,* 606 P.2d 28, 30 (Ariz. App. 1970) (no vicarious liability for actions of elected officials because their duties are imposed by law).

The Court finds that the Defendant has no control over the statutory duties of the Sheriff or his officers to arrest and take before a magistrate for examination all persons who attempt to commit or who have committed a public offense. A.R.S. § 11-441(A)(2). The alleged grossly negligent criminal investigation was conduct necessary for the prompt and orderly administration of criminal justice, taken pursuant to section 11-441, and therefore, the Defendant may not be held liable under the doctrine of *respondeat superior* for the conduct of Deputy Montoya.

**Accordingly,**

**IT IS ORDERED** that Plaintiff's Motion to Strike Supplemental Statement of Facts and Reply to Nonmovant's Statement of Facts (document 57) is GRANTED.

**IT IS FURTHER ORDERED** that the Defendant's request for oral argument is DENIED because the parties submitted memoranda thoroughly discussing the law and evidence in support of their positions, and oral argument would not have aided the court's decisional process. *See Mahon v. Credit Bur. of Placer County, Inc.*, 171 F.3d 1197, 1200 (9th Cir. 1999) (explaining that if the parties provided the district court with complete memoranda of the law and evidence in support of their positions, ordinarily oral argument would not be required).

**IT IS FURTHER ORDERED** that the Defendant's Motion for Summary Judgment (document 40) is GRANTED.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter Judgment accordingly.

DATED this 28th day of September, 2006.

David C. Bury
United States District Judge